**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 CR 00888-5 |
| v. | ) | Judge James B. Zagel |
| | ) | |
| ALONZO MONK | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT ALONZO MONK'S POSITION PAPER AS TO SENTENCING FACTORS

**I.     Introduction**

Having committed a serious crime, Alonzo Monk set out to make amends as best he could. He rejected the option of defending against the government's charges and elected to cooperate with the government in its effort to fight corruption. He was a model cooperator: he put his life on hold for three years, he patiently and painstakingly responded to countless government inquiries in dozens of meetings, and he testified in a forthright manner at two trials, neither bending in favor of the government nor in favor of his once-close friend, former Governor Blagojevich. When he was not meeting with the government or testifying during these three years, he threw himself into volunteering for the benefit of others: coaching children's sports and assisting his church and school.

In return for his cooperation, the government will fulfill its obligation to seek a downward departure from the advisory guidelines. But in other respects, the government's response to Lon Monk's cooperation has been disappointing. Once he made a proffer that rendered it impossible for him to defend against the government's charge, the government took

positions and imposed terms on him that are neither justified, proportional to the government's treatment of other cooperators, nor consistent with the terms of the plea agreement or the sentencing guidelines themselves.

The disappointing quality of the government's response to Lon Monk's cooperation is most easily demonstrated in its request for a fine of $75,000 or more – a fine that would be at or above the guideline range. That request comports with neither the letter nor the spirit of the government's agreements with Lon Monk, and the court should reject it. In that same spirit, when deciding whether to accept the period of incarceration set forth in the plea agreement, the court should carefully exercise the prerogative expressly (and unusually) granted to it in the language of that agreement's Rule 11(c)(1)(c) provision: to "determine whether to accept this agreement and the sentence provided herein based upon, and after it has been provided at the sentencing with, the details of Defendant's offense, the extent of his truthful cooperation with the government, and any matters in aggravation and mitigation of sentencing." We ask that it do so in light of the mitigating information that post-dates the plea agreement, as well as the considerable mitigation that existed at the time of the plea, all of which is described below.

## II.    Additional Facts Relevant to the Sentencing

The plea agreement and the Government's Version of Events accurately and fairly describe Mr. Monk's criminal conduct. But they do not capture all the facts relevant to the sentencing. Set forth below are additional relevant facts:

### A. Mr. Monk's Acceptance of Responsibility

In words not written by his lawyer, Mr. Monk has acknowledged that he conspired to solicit a bribe from John Johnston and has accepted responsibility for his wrongdoing. As he

wrote to the Probation Office, "there isn't a day that goes by" that he is not sorry for having engaged in that conduct.

Rather than merely professing his regret, he set out to do something about it. Most notably, he acknowledged his debts to society and to his family. As his first step to repay those debts, he elected to cooperate with the government "in their efforts to straighten out the political system in Illinois." His second step has been to get closer to his sons and to "set an example for them" so they can "learn from [his] mistakes." And, while he does not consider doing so to be part of repaying his debt to society, he has devoted himself to volunteer work, as is more fully described in Part IIC below.

## B. Mr. Monk's Cooperation

By all measures, Mr. Monk was a model cooperator. His life has been on hold for three years as he waited, with a prison sentence ahead of him and limiting his work options, for the government to complete its prosecution of Governor Blagojevich. Leaving aside countless hours of trial preparation for which there is no record, Mr. Monk had 25 separate proffer sessions with the government, starting in February of 2009. The single-spaced FBI memoranda of those sessions consume 263 pages. As the case agent told the Probation Office in typically understated fashion, Mr. Monk's cooperation was "full and complete," and he was an "important witness" in the Blagojevich trial.1/

Of course, cooperation is not merely measured by the amount of time devoted, or by the government's assessment of the cooperation. The real test of cooperators is whether they testify

---

1/      Judging from the Government's Sentencing Memorandum in *United States v. Rezko*, Mr. Monk's statements were not only important at the Blagojevich trials but also in helping the government obtain cooperation from Rezko. *See, e.g.,* Government's Sentencing Memorandum, *United States v. Rezko*, at 43. In addition, the government itself acknowledged at the Rezko sentencing that it was "relying on [Mr. Monk's] information against Rezko. Government's Supplemental Sentencing Memorandum, *United States v. Rezko* at 5.

3

truthfully: acknowledging what happened, without piling on the defendant with the hope that doing so will curry favor with the government. The court undoubtedly formed its own impression on this issue, but we respectfully submit that Mr. Monk's testimony was exemplary on this score. His testimony was straightforward, truthful and unimpeachable; he laid out exactly what his conduct was and took responsibility for it. The quality of his testimony is a reflection of the fact that he cooperated for the right reasons: because he thought that telling the truth was the right thing to do, both for the citizens of the state and for his own family,

Mr. Monk's cooperation went beyond his proffers and his testimony. In distinguishing Mr. Monk from Rezko, the government itself acknowledged – and acknowledged the value of – the fact that Mr. Monk "agreed to forgo litigating legal issues he might otherwise have raised:

> "For example, prior to the first Blagojevich trial, it was unclear what effect the Supreme Court's ruling in the then-pending cases of *Skilling* and *Black* would have on Monk's plea – he had pled to a single honest services mail fraud count. Rather than wait to see if the Supreme Court would give him a basis to revoke his plea, which Monk was legally entitled to do, he agreed to plead guilty to an extortion count before the Blagojevich trial, which thus eliminated a potentially distracting legal and factual issue."

Government's Supplemental Sentencing Memorandum, *United States v. Rezko*, at 5-6.

### C. Mr. Monk's Character

As his pastor wrote to the court, "Mr. Monk is a good man who got himself into trouble." Other than his conduct in this case, Mr. Monk is uniformly admired as a kind and an honorable man and, above all, a family man. To his family, he has shown "extreme remorse and regret," and "has apologized for the pain his actions have brought about." He has a loving and supporting wife and three sons, aged 16, 11 and 6. He is "always there for his family," and is a "caring yet strict father." As his wife Laura told the Probation Office, he is fun, loyal, and honest, and spends substantial time with his sons.

4

His wife's assessment of him is confirmed by those who know him, not just in the usual letters from friends and family, but also by neutral, independent people he encountered in business. As at least one of them told the Probation Office, Mr. Monk is "a first class guy who was well regarded in our industry."

His friends and family members flesh out these qualities in greater detail. In the three years he has been under indictment, Mr. Monk "chose to live productively," rather than "wallow in self-pity." He has been productive in the most old-fashioned way: by working hard for the benefit of others. He has thrown himself into being an active volunteer in the community, helping to coach basketball, cross-country and track teams, and he has also thrown himself into raising funds and being the jack-of-all-trades volunteer for a local parochial school.

In his role as a coach, other parents have been "amazed by his commitment to the programs," and have expressed gratitude for the many hours he has donated and the help he has provided to children in developing them as athletes. Those parents have also remarked favorably on his "patient and encouraging" manner with their children. By managing to be "patient, kind, firm," and encouraging, he has "instilled in them many traits that make [the children] better competitors and people: sportsmanship, discipline, confidence and dedication."

At the school, "he works harder and longer" than other volunteers and "does so without complaint or need for compliment." He is known as a person who will "jump right in to help and support whatever the activity might be." If he is not coaching, he works the concession stand. He works the fish fry. He can be found "cleaning up after athletic events when help runs short." He is the person always available when he is needed, and he is "a valued member of his school and church community."

5

Those who know Mr. Monk all recognize his "caring, respectful attitude toward everyone," and appreciate the "positive impact" he has on those around him. As his sister reports, he is someone who can be counted upon in caring for his family. She knows all too well because now, in addition to his commitment to his family, his coaching and his work on behalf of the school, he is there whenever needed to assist her in the care of his father, who is suffering from Alzheimer's disease.

### D. Mr. Monk's Life Since He Began To Cooperate

When Mr. Monk began to cooperate in February 2009, and when the government returned its first indictment in April 2009, Mr. Monk and his family lived in Park Ridge. But the humiliation he suffered, together with a series of individuals who "stalked" their house and constantly rang their doorbell, led the family to relocate. In addition to uprooting the family, the relocation required the Monks to take a loss on the sale of their home.

Testifying twice against his old friend Blagojevich was a difficult experience. Blagojevich made this even harder than necessary, saying things to the press about Mr. Monk's mother (deceased) and his father (suffering from Alzheimer's disease). Among the painful statements Blagojevich made to the press: "As my old friend was testifying and saying things that he knew weren't true, I couldn't help but think about times that we spent together. I couldn't help but think about his mother and his father, especially his father, and the shame that his father probably feels."

Due to the partially hung jury in the first Blagojevich trial, Mr. Monk's cooperation has lasted far longer than anyone expected. Given his relocation to a place where he lacked business contacts, given the economy, and given his unavailability over the long term (due to a pending period of incarceration), he has not been able to find any regular employment despite

6

considerable effort. He has made himself into a productive member of the community by volunteering his time selflessly, as described in Part IIC above. But without regular employment during the three-year cooperation period, he and his family have been supporting themselves by depleting their assets.

### E. Money Received from Antonin Rezko

The conspiracy to solicit a bribe from Mr. Johnston to which Mr. Monk pled guilty is a serious offense, and Mr. Monk does not mean to minimize it. But for the reasons noted in Part IIF below, that offense alone would not in any way justify the above-the-guidelines fine the government seeks. Rather, the government has gone to great lengths to include reference in its Version to a different offense, involving money Mr. Monk received from Antonin Rezko while Mr. Monk was Governor Blagojevich's Chief of Staff. The government's Version expressly acknowledges that its request for a fine in an amount of "at least the high end" of the guidelines is based not on the offense to which Mr. Monk pled guilty, but on Mr. Monk's receipt of money from Rezko. Version at 10. We therefore address below the facts relating to Mr. Monk's receipt of money from Rezko and, most importantly, the facts relating to how the government learned about Mr. Monk's receipt of that money.

Mr. Monk does not dispute that Rezko gave him money as described in the government's Version. But the government's Version reads as if Rezko tipped the government off to these payments, and that the government then got the idea to go out and corroborate Rezko by looking at Mr. Monk's cash withdrawals. *See* Government's Version of the Offense at 10-11 (referring to statements by Rezko made on March 26, 2009).

The impression left by the government's Version is false. Mr. Monk not only was the person who first told the government about these payments, (on February 5, 2009), but he also

7

advised the government that these payments were received in the context of discussions among Rezko, Blagojevich, Christopher Kelly and Mr. Monk about how the four of them could make money from their control over the state government – a fact that was a centerpiece of the government's presentation at the first Blagojevich trial, in part because it connected the dots between what otherwise was a disparate set of corrupt activities by different people.  And, far from some form of corroboration the government came up with after hearing from Rezko, the fact that his cash withdrawals "almost stopped completely" while he was receiving cash from Rezko, *see* Government's Version at 11, is something Mr. Monk himself told the government on February 13, 2009, before it asked and before it heard anything at all about the cash from Rezko. It was Mr. Monk who supplied all this information to the government at a time when no one else had done so – in fact, in circumstances in which no one else was ever going to do so – and he supplied that information pursuant to the express understanding in his proffer and plea agreements that it would not be used in aggravation of his sentence under Guideline 1B1.8.

### F.  Without Mr. Monk's Testimony, the Johnston Solicitation Was A Mixed Bag

Without meaning to suggest that Mr. Monk is anything but guilty of conspiring to solicit a bribe from John Johnston, and without diminishing the significance of that offense, the court may consider several aspects of the context of this offense in assessing punishment.

First, the government has acknowledged that Mr. Monk's participation in this conspiracy was considerably less than "all in."  As the plea agreement describes, while at times Mr. Monk assisted Blagojevich's efforts to obtain campaign contributions from Johnston in return for the enactment of legislation that would be helpful to horse racing tracks that Johnston owned, "at other times," Mr. Monk "attempted to get Blagojevich to take actions that would have had the effect of reducing the pressure" on Johnston to make a campaign contribution to Blagojevich.

Plea Agreement at 3. And after Mr. Monk engaged in a criminal effort to obtain a contribution from Johnston – an effort that had not at that point succeeded, and never did succeed – the government agrees that Mr. Monk "did not want to deal further with [Johnston] about the contribution request and made no further efforts to contact [Johnston] or to follow up with Blagojevich." *Id.* at 8.

Second, at the time of this offense, Mr. Monk was not a public official. He was not being paid for his work, nor did he receive or expect to receive any financial benefit for his role in the offense. As the Presentence Investigation Report concludes, "there is no evidence that Defendant Monk created the conspiracy or was actively involved in the conspiracy aside from communicating each party's wishes" – which, as the Plea Agreement noted, he did so for Blagojevich only some of the time. On those occasions, he appeared to have done so out of loyalty to his old friend, Blagojevich, rather than for personal profit.

Third, without Mr. Monk's incriminating interpretation of the tape recordings, this episode has many mitigating and potentially even exculpatory facts:

- At the time Mr. Monk asked Johnston for a campaign contribution, Johnston had previously been a campaign contributor to Blagojevich, without any hint that he had been extorted.

- When Mr. Monk discussed the requested contribution with Blagojevich, he expressed concern about the appearance of seeking the contribution at the time the legislation was being considered.

- When Mr. Monk reported to Blagojevich about his conversations with Johnston, he exaggerated how aggressive he had been with Johnston.

- When Mr. Monk was asking Johnston for a contribution and discussing the pending legislation, Mr. Monk assured Johnston that these were "two separate conversations."

- Mr. Monk was urging Governor Blagojevich to sign the legislation that Mr. Johnston was seeking, even before any campaign contribution was made – an act that would have seriously undermined the extortion. Not only did he personally urge Governor Blagojevich to sign the bill, but he followed up with the governor's friend and advisor Chris Kelly to obtain help and advice about getting the governor to sign.

By pointing out these facts, we do not mean to suggest that Mr. Monk was not guilty. In fact, he gave truthful, incriminating explanations of these facts in his trial testimony. Rather, the point is that the tape recorded conversations contain many mitigating circumstances, and presented his lawyer with the opportunity to present exculpatory explanations of these events. Without Mr. Monk's testimony, the government may have ended up without a strong case on the racetrack legislation.

### G. Mr. Monk's Plea Agreement

Unlike most of the plea agreements arising out of this investigation, Mr. Monk's plea agreement refers to Rule 11(c)(1)(c). Without describing any plea negotiations, suffice it to say that Mr. Monk did not at any time have any desire whatsoever to have a plea agreement that in any way had anything to do with Rule 11(c)(1)(c).

The language of the Rule 11(c)(1)(c) provision in Mr. Monk's agreement is not standard. It specifically calls out the parties' agreement that the court should make its own assessment of the sentence, explaining that "the parties further agree that the district court should determine whether to accept this agreement and the sentence provided herein based upon, and after it has been provided at the sentencing with, the details of Defendant's offense, the extent of his truthful

10

cooperation with the government, and any matters in aggravation and mitigation of sentencing." Plea Agreement, para. 14. Pursuant to that non-standard provision, the parties agreed to a sentence of 24 months. In a separate provision, the agreement gives the government the right to argue for a fine at or above the top of the guideline range, which is $75,000.

Paragraph 7 of the plea agreement sets forth different items of self-incriminating information supplied by Mr. Monk pursuant to the terms of his proffer agreement, including the money he received from Rezko. Addressing the use of that information, the plea agreement promises that "this information may not be used in determining the applicable guideline range for Defendant *or in aggravation of Defendant's sentence.*" (emphasis added).

**H. Other Sentences in This and Related Cases**

While the main wrongdoers have faced stern punishment, other cooperators in the case have not. A more complete listing of pleas and dispositions of other defendants in this and related cases are described at the start of the Presentence Investigation Report.

Of particular note is the case of Joseph Cari. Cari was a managing director of a private equity firm. At the behest of Stuart Levine, and in a series of conversations, Cari extorted a consulting contract worth close to $1 million out of a firm seeking to do business with the Teachers' Retirement System of the State of Illinois. When Mr. Cari pled guilty and agreed to cooperate, the government did not insist upon a Rule 11(c)(1)(c) agreement, but instead merely recommended a sentence of two-thirds of the low end of the guideline range – in effect, a recommendation of about 25 months. The court declined to follow that recommendation and instead sentenced Mr. Cari to three years of probation.

**III.** **The Government's Request for a Fine "At Least [at] the High End of the Anticipated Advisory Sentencing Guidelines Range" Is Totally Unjustified**

The crime to which Mr. Monk pled guilty is not a crime that would in any way justify a fine at or above the high end of the guideline range. While it is a serious offense, the guidelines already treat it seriously – the involvement of the governor, for example, increases the sentence by four levels – and there is nothing about the offense that would take it out of the guidelines in an upward direction. To the contrary, there are aspects of the offense that would pull it in the opposite direction, such as Mr. Monk's reluctant and inconsistent participation, and his lack of personal profit.

Acknowledging this reality, the government seeks to justify its literally over-the-top request for a fine by attributing its excess not to the offense of conviction but rather to the money Mr. Monk received from Mr. Rezko several years earlier, while Mr. Monk was a public official. Government's Version at 10. But the problem with this approach is that it violates the proscriptions in the proffer letter, the plea agreement, and Guideline 1B1.8 against using information Mr. Monk proffered in aggravation of his sentence.

Anticipating this issue, the Government's Version presents the information about the money received from Rezko as if it came independently from Rezko, and as if it had reliable proof of the payments from sources other than Mr. Monk. This approach is fails as a matter of law.

There can be no dispute that the information originally came from Mr. Monk. All of the government's supposed independent proof is entirely derivative of Mr. Monk's original statement. When Mr. Monk made his proffer, Rezko had already given statements to the government, but made no mention of these payments until after Mr. Monk told the government about them and after the government then confronted Rezko about what Mr. Monk had

proffered. See Government's Supplemental Sentencing Memorandum, *United States v. Rezko*, at 11. The government's claimed corroboration of Rezko by the IRS – proof the government correctly offers only as purported corroboration rather than sufficient proof on its own – also came directly from Mr. Monk in his earlier proffer.

Using the information from the proffer against Mr. Monk under these circumstances is no way to treat a cooperator, and it is prohibited. As the Eleventh Circuit has declared in establishing rules governing the use against a defendant of facts learned from that defendant in a protected proffer, the government can at sentencing prove those facts if the government can present truly independent sources, but "the government may not evade U.S.S.G. 1B1.8(a) where evidence was elicited solely as a result of, or prompted by, the defendant's cooperation." *United States v. Pham,* 463 F.3d 1239, 1244 (11th Cir. 2006).

Almost the same facts as this case arose in *United States v. Lopez,* 605 F.Supp.2d 852 (S.D. Tex. 2009), in which the government sought to use against the defendant information that he proffered and his co-defendant then corroborated. Despite plea agreement language allowing derivative use and the pursuit of investigative leads from the proffer, the court upheld the defendant's objection to the use of his co-defendant's information at sentencing. Noting that plea and cooperation agreements must be construed in light of "special due process concerns," and that "in view of the Government's tremendous bargaining power, courts should strictly construe the text against the Government when it has drafted the agreement," *id*. at 856, the court placed the burden on the government to show that the information provided by the defendant in a proffer that is then used against the defendant was "provided by other sources independent of the information provided by the defendant." *Id.* at 859. The court held that the repetition of the defendant's information by a co-defendant who was confronted with that information is more

like direct use than derivative use and cannot be admitted against the defendant at sentencing.
*Id.*2/

That the government would nonetheless insist on the right to argue for an above-guidelines fine is a measure of the starkly uneven bargaining power that has led courts to "strictly construe the text [of a proffer agreement] against the Government when it has drafted the agreement." *Id*. at 856. This bargaining power is particularly overwhelming after the defendant has incriminated himself in a proffer. Once the defendant has incriminated himself and negated in his proffer any possible defense his lawyer might have offered, he is entirely at the government's mercy.

In this case, rather than showing mercy, the government went in the opposite direction, especially by attempting to use the Rezko money in aggravation of Mr. Monk's sentence. In so doing, it attempted to punish Mr. Monk for providing valuable information it would never otherwise have received, even though it was so happy to have received that information that it made that information central to one of its prosecutions. In so doing, it had to rely on the offer of testimony from an individual whom it has repeatedly refused to call as a witness at any trial, and whom it has repeatedly labeled a liar subject to "devastating cross-examination."3/ And in so doing, it disregarded the agreements it made with Mr. Monk.4/

─────────────────────

2/      While we have not found a Seventh Circuit case directly on point, the Court of Appeals in a decision by Judge Bauer endorsed many of the same principles as the *Lopez* court, explaining that proffer agreements are "unique contracts and the ordinary contract principles are supplemented with a concern that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause." *United States v. Farmer*, 543 F.3d 363, 374 (7th Cir. 2008). The court also required that the government be held to "the literal terms" of the agreement, as well as "the most meticulous standards of both promise and performance to insure the integrity of the bargaining process involved in proffers." *Id.*
3/      Government's Supplemental Sentencing Memorandum, *United States v. Rezko*, at 11-12. Although the government offered to the court supposedly independent proof of Mr. Monk's receipt of funds that rests on Rezko, the government failed to acknowledge that it has repeatedly elected not to use

14

We respectfully submit that the court must assess the appropriate fine, and the 24-month sentence, without considering for any purpose the money Mr. Monk received from Rezko. To do otherwise would be to release the government from its promise that it would not use the proffered information "in aggravation of [Mr. Monk's] sentence,"5/ and would be to fail to ensure that the bargaining process provided the "fundamental fairness" required by *United States v. Farmer,* 543 F.3d 363, 374 (7th Cir. 2008). *See also United States v. Fields,* 766 F.2d 1161,

---

Rezko as a witness, and with good reason. *See* Government's Sentencing Memorandum, *United States v. Rezko*, at 42, 44. *According to the government itself,* not only did Rezko lie repeatedly to the government about the very subject on which the government would offer his testimony, but after he got caught – and after he supposedly was cooperating – he lied about why he had lied the first time, or, more precisely, *the first 19 times*. *See* Government's Supplemental Sentencing Memorandum, *United States v. Rezko*, at 11. He engaged in many separate frauds and acts of corruption. *Id.* at 8; Government's Sentencing Memorandum, *United States v. Rezko*, at 2-28. Even more telling, he lied repeatedly to the court in trying to get himself out on bond. *Id.* at 11-12. The government claims to have corroborated Rezko through an analysis of cash withdrawals, but no corroboration can rescue a witness as embarrassingly unreliable as Rezko. In any event, its cash analysis is nothing like the careful and complete work up of a defendant's entire financial position that is ordinarily seen in this courthouse, and the analysis has telling gaps: for example, no work was done to exclude the possibility that Mr. Monk and his wife, who got married right at the start of the period in which the cash withdrawals declined, were given cash at their wedding by family members or friends other than Rezko. As a result, even if were somehow permissible for the government to ignore both the letter and the spirit of its commitment to a cooperating witness, its supposedly independent proof that Mr. Monk received the funds would be insufficient.

4/ Judging from the government's summation at trial, it appears that its position about Mr. Monk's fine may have been motivated by its desire to say to the Blagojevich jury that Mr. Monk would not have made up his story about the Rezko money because doing so placed Mr. Monk at greater risk. Or perhaps it was based on the fear that the jury would not look favorably on Mr. Monk and/or the government if he were allowed to retain the money given to him by Rezko. But such trial strategies are no basis for violating an agreement or for treating cooperating witnesses unfairly, and in any event are no basis for the court to accept such a violation or such unfairness.

5/ Any argument that the government is prohibited merely from using the information to justify a different guideline range, and is not prohibited from using this information to argue for a sentence at the high end of the guideline range, is defeated by the text of the plea agreement. That text prohibits the government not just from using the information "in determining the applicable guideline range," but it also specifically goes on to prohibit the government from using the information "in aggravation of Defendant's sentence." To accept such an argument by the government would be to strip all meaning from that last phrase, and to ignore the Seventh Circuit's admonitions that the government must be held to "the literal terms" of the agreement, that the government must live up to "the most meticulous standards of both promise and performance to insure the integrity of the bargaining process involved in proffers," and that the court must supplement ordinary contract principles "with a concern that the bargaining process not violate the defendant's rights to fundamental fairness under the Due Process Clause." *United States v. Farmer,* 543 F.3d at 374.

15

1167-68 (7th Cir. 1985) (emphasizing the government's obligation to avoid loose language in its plea bargain commitments, and requiring "strict adherence" to the government's promises).

Without the Rezko money, this case at most would have called for a garden variety, low-end-of-the guideline range fine, which would be $7,500. In response to a government recommendation based on proffer-protected information and seeking a fine at the top of or above the guideline range, Mr. Monk respectfully requests that the court instead impose a fine at, or possibly below, the low end of the guideline range. A below-guidelines fine is also appropriate due to the lost earnings he suffered during the additional time he spent in "cooperator limbo" as a result of the hung jury in the first Blagojevich trial.

## IV.    Factors for the Court To Assess In Determining Whether to Accept the Agreement

Federal sentencing law requires the court in every case to impose "a sentence sufficient, but not greater than necessary, to comply with" the purposes of federal sentencing, in light of the sentencing guidelines and Section 3553(a). *Freeman v. United States,* 131 S.Ct. 2685, 2692 (2011); *United States v. Dean,* 414 F.3d 725, 729 (7th Cir. 2005). Section 3553(a) describes those purposes as (1) reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment; (2) deterrence; (3) protecting the public from further crimes by the defendant; and (4) rehabilitation. *See* 18 U.S.C. § 3553(a)(2). Also of considerable import is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *United States v. Newson,* 428 F.3d 685, 688 (7th Cir. 2005); 18 USC 3553(a)(6). The mandate that a sentence be the minimum possible to satisfy these objectives sets an independent upper limit on the sentence a court can impose, even if a strict application of the Guidelines would lead to a more severe result. *See, e.g. United States* v. *Dean*, 414 F.3d at 729.

These factors apply equally to a plea under Rule 11(c)(1)(c), *see, e.g., Freeman v. United States,* 131 S.Ct. at, 2692 and are especially applicable to this agreement, with its unusual language reflecting the agreement of the parties that the court should weigh these factors in deciding whether to accept the plea. We therefore offer below information to assist the court in applying these factors, starting with information that did not exist at the time of the plea, and then adding information that was available at the time of the plea.

### A. New Information That Did Not Exist At the Time of The Plea

In the three years since Mr. Monk pled guilty, there have been some significant mitigating developments.

### 1. "Just Punishment" and The Length of Time In "Cooperator Limbo"

In the court's evaluation of a "just punishment," the court should consider that Mr. Monk has already served an unpleasant form of a sentence. He and his family were essentially run out of town. He has had a three-year period in which his life has been put on hold and in which circumstances have made it impossible for him to obtain regular employment and support his family. Some period of time in this "cooperator limbo" is anticipated when a decision to plead guilty is made, but due to the hung jury in the first Blagojevich trial, the period during which Mr. Monk had to suffer through these conditions was considerably longer than the parties anticipated at the time of the plea. The plea agreement could not and does not take any account of this additional chunk out of Mr. Monk's life that was devoted to his cooperation.

### 2. Sentencing Disparities and the Sentencing of Other Cooperating Defendants

Another significant development in the three years since Mr. Monk pled guilty is that the sentencing of other cooperators has begun. The first such sentence, Joseph Cari's, has created precisely the sort of sentencing disparity that should be avoided. While no two defendants and

their cases are exactly alike, Joseph Cari and Mr. Monk have some essential similarities.  Like Mr. Monk, Mr. Cari pled guilty to one offense, an extortion.  Also like Mr. Monk, Mr. Cari did not receive a payment in exchange for his criminal conduct.  Like Mr. Monk, Mr. Cari was a model cooperator.

But unlike Mr. Monk, Mr. Cari's plea agreement made no reference to Rule 11(c)(1)(c).  Cari was engaged in a far more valuable extortion, and the guideline calculation for his offense placed him in a range of 70 to 87 months – approximately *double* Mr. Monk's guideline range of 37 to 46 months.  Mr. Cari's cooperation required him to meet with the government five times, apart from his trial testimony, while Mr. Monk had five times as many meetings.  These facts would suggest that Mr. Monk should receive a lighter sentence than Mr. Cari.  But Mr. Cari has already been sentenced to three years probation.  The court can consider whether there is any difference between Mr. Cari's case and Mr. Monk's that can justify a disparity of that magnitude.6/

Mr. Cari's sentence is not the only one that establishes as harsh a 24-month term for Mr. Monk.  The same result follows from a review both of likely or agreed sentences at or above 24 months, and of additional cases that appear likely to be probationary.

As best we can determine, there are only two defendants who supplied any useful cooperation and who have agreements that may yield sentences greater than 24 months:  Stuart Levine and Jacob Kiferbaum.  Both engaged in acts of corruption that were far more lucrative than Mr. Monk's, and that sought actual dollars in their own pockets as opposed to a campaign

6/     We anticipate that the government will argue that it could have charged Mr. Monk with additional offenses.  But the Johnston solicitation was the strongest of weak lot; anything else was significantly weaker.  No other episode in which Mr. Monk was involved was even presented to the jury at the second Blagojevich trial.  In addition, all that information was proffer protected, so that for the reasons set forth in Part IIF above the government would have to establish independent sources of proof.  And in any event, the same could be said of the other cooperators.

contribution for someone else. Levine was a corrupt public official and the leader of a one-man crime wave, and he was the prime personal beneficiary of corruption worth between $7 million and $20 million. *See*, *e.g.*, Plea Agreement, *United States v. Stuart Levine*, at 44. Kiferbaum owned and operated a construction company, and he conspired with Levine and others to use Levine's official position in an effort to obtain a contract to build a hospital that would have benefited Kiferbaum's company to the tune of between $1 million and $2.5 million. *See*, *e.g.*, Plea Agreement, *United States v. Jacob Kiferbaum*, at 6. In contrast to Mr. Monk, who worked to accomplish what John Johnston wanted even though Johnston had not made the requested contribution, Kiferbaum took the opposite approach: when the hospital refused to hire Kiferbaum, Kiferbaum complained to Levine and Levine killed the hospital's application to build a new facility. Levine's agreement calls for a sentence of 67 months, and Kiferbaum's calls for 27 months.

On these facts, we invite the court to consider the sentencing disparity between Mr. Monk and Mr. Kiferbaum. Mr. Monk was soliciting a campaign contribution for someone else (and he sought it from someone who had previously made such contributions to the candidate), while Mr. Kiferbaum was seeking to line his own pocket. Mr. Monk's crime was worth $100,000 to Governor Blagojevich, while Mr. Kiferbaum's was worth $1 million to $2.5 million to himself. Mr. Monk displayed reluctance to proceed with Governor Blagojevich's directions to extort Mr. Johnston, and eventually stopped following those directions, while Mr. Kiferbaum consistently threatened the hospital officials. Mr. Monk continued to seek what John Johnston wanted – Governor Blagojevich's signature on the racetrack legislation – despite the fact that Johnston had not made the contribution, while Mr. Kiferbaum made sure that if his company was not hired to build the new facility, that facility would not be built at all, regardless of the negative impact on

19

patient care.  Just as punishing Mr. Monk far more harshly than Joseph Cari is an unwarranted sentencing disparity, punishing Mr. Monk in approximately the same manner as Mr. Kiferbaum is also just the sort of disparate treatment that the Court of Appeals hopes to avoid.

Other cooperators have not yet been sentenced, but all signs suggest that they will receive sentences that will add further to the disparate quality of a 24-month sentence for Mr. Monk. Among other cooperators who already appear likely to be put on probation with Mr. Cari are John Glennon and Steve Loren.  While serving as outside counsel for a public pension plan, Loren prepared sham contracts at the direction of Stuart Levine.  Loren knew that the contractors would do no work and would kick back some of the money received at the direction of Levine. Not only did Loren therefore assist in, and help to cover up, Levine's extortion and official corruption on several occasions, but he also concealed multiple kickback transactions from his client, the Teachers' Retirement System, and he knowingly assisted a contractor in defrauding the IRS.  Nonetheless, the government allowed him to plead to one tax count and gave him a "free fall" departure, with the government making no recommendation of what the sentence should be.  The court should consider, after removing the Rezko funds from the balance, whether there is any convincing justification for sending Mr. Monk to jail for two years while Mr. Loren gets probation.7/

### 3.  Rehabilitation and Mr. Monk's Conduct During the Last Three Years

Mr. Monk's conduct described in Part IID above demonstrates his rehabilitation far better than could any words or promises.  It would have been easy to sit in despair over his mistakes and in the face of an impending prison term, but he chose a much better path.  As Judge Rakoff explained in *United States v. Adelson,* 441 F.Supp.2d 506, 514-515 (S.D.N.Y. 2006), "surely, if

---

7/      Still other cooperators were allowed to plead to offenses such as false statements, and were offered "free fall" departures.  Even more fortunate cooperators received immunity.

ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in relation to the context of his life overall hitherto, it should be at the moment of his sentencing, when his future hangs in the balance." The court should view Mr. Monk's good work over the past three years as proof of rehabilitation, and take it into account in assessing whether 24 months is more than necessary to meet the purposes of Section 3553(a).

### B. Previously Existing Information, Recognized After the Fact By the Government

As a result, whatever the quality of the sentencing provisions of the plea agreement at the time the plea was reached in 2009, circumstances since then have changed, and have added considerable mitigation that was not present in 2009. But there already existed in 2009 substantial information about the harsh quality of a 24-month sentence for Mr. Monk's conduct, as this simple description underscores:

> "In the end, Monk's plea agreement requires that he be imprisoned for 24 months based on a single crime – Monk's attempt to extort Johnston for a $100,000 political contribution to Blagojevich. The government is seeking this sentence even though Monk agreed to cooperate before he was charged, never lied to the government after he began cooperating, agreed to waive a series of legal arguments, testified twice against Blagojevich, and has otherwise cooperated fully."

Far from some bleeding-heart or defense lawyer spin on Mr. Monk's plea agreement, *this is the government's own description of it,* found in its presentation to the court about Rezko's sentence, two and a half years after Mr. Monk pled guilty. Government's Supplemental Sentencing Memorandum, *United States v. Rezko*, at 6.

That the government itself trumpets Mr. Monk's sentence as a tough one is powerful confirmation of its harsh quality. It is also confirmation that the plea agreement was the function of the unequal bargaining power that exists once a defendant has made a complete and truthful proffer and thereafter has no ability to defend himself, as was the case for Mr. Monk. That unequal bargaining power allowed the government to reserve the right to argue for an above-

guidelines fine based on information it would not have obtained other than through Mr. Monk's protected proffer. That same unequal bargaining power infects a 24-month term for an unsuccessful solicitation of $100,000 in which Mr. Monk received no money personally (and would not have received any even if the solicitation had succeeded),8/ and in which the government's own recorded conversations show Mr. Monk's reluctance to proceed, as well as his efforts to undermine the extortion.

Only by considering the Rezko money could this case seem like one that requires a sentence much more severe than that imposed on Joseph Cari, or much more severe than the one that is in the offing for Steve Loren, or somehow equal to Jacob Kiferbaum's. But for the reasons set forth above, consideration of the Rezko money is forbidden. We respectfully request that the court instead consider the other factors set forth in this Memorandum. The plea agreement leaves no doubt that the court is free after reviewing all the factors to accept or reject the plea, and the court is free to explain the reasons for its decision.

In so doing, it can and should bring a fresh perspective that takes into account the honesty and dedication of Mr. Monk's cooperation; the quality of his character and rehabilitation; the nature of his offense, including the mitigating facts as well as the incriminating; the extra and unexpected time he spent in "cooperator limbo;" and the harsh quality of his sentence compared to other cooperators, including the sentence of a another cooperator to probation despite the government's recommendation of a term like Mr. Monk's. We ask that the court also assess both

---

8/      Mr. Monk did not profit from the crime, and therefore received "limited gain in comparison to the amount of loss" upon which the guidelines are calculated. *See United States v. Forchette,* 220 F. Supp. 2d 914, 925 (E.D. Wis. 2002) (partially basing downward departure on the "gross disparity" between a loss amount of $464,300 and an estimated "profit" to defendant of between $18,000 and $54,000). This fact is significant enough to be considered as one factor that, together with others, could warrant a downward departure. *United States v. Corry,* 206 F.3d 748, 751 (7th Cir. 2000). *See also United States v. Stuart,* 22 F.3d 76, 80-81 (3d Cir. 1994) (arguing for downward departure for defendant who made $2,000 but was sentenced based on $129,000 of loss).

the government's own trumpeting of the harsh quality of a 24-month term, as well as its disregard of the letter and spirit of its promises in the plea agreement, and then determine – as the parties expressly licensed it to do – whether under these circumstances a 24-month term is in fact "a sentence sufficient, but not greater than necessary, to comply with" the purposes of federal sentencing.

## V.     The Court Should Not Impose A Term of Supervised Release

In effect, Mr. Monk has already been on supervised release for three years.  He has been a model citizen and has never violated any terms of his release.  During that time he has devoted himself to volunteer work, and by all accounts he has done so with great attitude and to great effect.   Prolonging supervision after his release would be both unnecessary and a burden on the probation office, especially at a time when United States Probation is short on resources. Application Note 1 to Guideline 5D1.1 directs that the "court may depart from this guideline and not impose a term of supervised release if supervised release is not required by statute and the court determines, after considering the factors set forth in [18 U.S.C. § 3583(c)], that supervised release is not necessary."  Supervised release is not required by the offense to which Mr. Monk pled guilty, 18 U.S.C. § 371, and none of the Section 3583(c) factors suggest any need for supervised release:  there is no criminal history, no need to protect the public from future crimes, and no need for vocational training or substance abuse treatment that could not be addressed during his time in custody.

## VI.    Objections to the Presentence Investigation Report

Mr. Monk thanks Ms. Kiekhafer for her courtesy and has no objections or corrections to the Presentence Investigation Report except as follows:

23

After the preparation of the draft Report, Mr. Monk was able to locate and provide a copy of his 2007 federal income tax return.  The receipt of that return should be noted at page 21, lines 579-582.

Mr. Monk asks that the description of the plea agreement at page 23, lines 659-669, be supplemented to include the non-standard language described in Part IIG above.

Respectfully submitted:

*/s/ Michael J. Shepard*
Michael J. Shepard

Michael J. Shepard
Hogan Lovells US LLP
Four Embarcadero Center
22nd Floor
San Francisco, CA 94105
415.374.2310

## <u>CERTIFICATE OF SERVICE</u>

I, Michael J. Shepard, an attorney, certify that on March 27, 2012, I caused a copy of the

foregoing **Defendant Alonzo Monk's Position Paper as to Sentencing Factors** to be served on

counsel for the government via CM/ECF electronic service.

I hereby certify that on March 27, 2012, I caused a true and correct copy of the foregoing

**Defendant Alonzo Monk's Position Paper as to Sentencing Factors** to be served by U.S. Mail

upon:

> Sarah Kieckhafer
> United States Probation Officer
> 55 East Monroe Street – Suite 1500
> Chicago, Illinois 60603
> (312) 435-5734

> */s/ Michael J. Shepard*
> Michael J. Shepard

Michael J. Shepard
Hogan Lovells US LLP
Four Embarcadero Center
22nd Floor
San Francisco, CA 94105
415.374.2310